# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 05-2009/2010/2046

_____

| | | |
|---|---|---|
| Equal Employment Opportunity Commission, | * * * | |
| Appellant/Cross-Appellee, | * * * | |
| Mohammed Shanif Hussein, | * * | |
| Intervenor Plaintiff-Appellant/Cross-Appellee, | * * * | Appeals from the United States District Court for the Eastern District of Missouri. |
| v. | * * | |
| Trans States Airlines, Inc., | * * | |
| Appellee/Cross-Appellant, | * * * | |
| Airline Pilots Association Int., (AFL-CIO), | * * * | |
| Defendant. | * | |

_____

Submitted: March 16, 2006
Filed: September 19, 2006

_____

Before SMITH, JOHN R. GIBSON, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

The Equal Employment Opportunity Commission ("EEOC") brought this action alleging that Trans States Airlines terminated Mohammed Shanif Hussein in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-2. Hussein subsequently intervened, asserting claims under Title VII and the Missouri Human Rights Act. Mo. Rev. Stat. § 213.010 *et seq.* Trans States moved for summary judgment on all claims, and moved for attorneys' fees. The district court[*] granted summary judgment for Trans States, but denied its motion for fees. We affirm the judgment of the district court.

I.

Hussein is a man of Indian descent who is a native of the island of Fiji, where he was raised as a Muslim. He moved to the United States in 1997. Trans States, which is based in St. Louis, Missouri, hired Hussein as a pilot on February 26, 2001. On September 13, 2001, when commercial air travel was suspended as a consequence of the terrorist attacks on September 11, Hussein returned a Trans States plane to the St. Louis airport. He then rented a room at a nearby Howard Johnson's hotel.

At some time between September 14 and September 17, 2001, Captain Daniel Reed, Trans States's vice president of flight operations, received what he said was an anonymous phone call regarding Hussein. According to Reed's testimony in this case, the caller reported that a pilot in a Trans States uniform had been in a bar at the Howard Johnson's hotel making comments about the attacks of September 11, and

_____

[*]The Honorable Thomas C. Mummert, III, United States Magistrate Judge for the Eastern District of Missouri, presiding with the consent of the parties pursuant to 28 U.S.C. § 636(c).

that a bartender had asked him to leave. Reed said that he asked how the caller knew the person was a Trans States pilot, and the caller replied that he had read the pilot's identification tag and then gave his last name as Hussein. Reed remembered the caller saying that a Trans World Airlines pilot had followed Hussein out of the bar, at which time Hussein took off some of his uniform pieces and went into another bar at the hotel.

Reed testified that he asked his flight managers about Hussein, and they confirmed that Trans States employed a pilot named Mohammed Hussein. Reed said he asked a manager on his staff to verify that Hussein was in St. Louis at the time of the reported incident. He recalled that within an hour, he received a report that Hussein should have been in the St. Louis area, and that he was a probationary employee. Reed stated that he then decided to dismiss Hussein and directed one of the flight managers to carry out the termination.

Michael Swoboda, then a flight manager at Trans States, informed Hussein of his termination on September 18. Swoboda testified that when Reed returned from taking the anonymous telephone call, he asked for information about Mohammed Hussein. Swoboda recalled telling Reed that Hussein was a first officer based in St. Louis, and that he was probably a probationary employee. Swoboda testified that Reed then directed Swoboda to terminate Hussein's employment. Another flight manager, Rodney Aman, overheard Reed speaking on the telephone when he received the anonymous call about Hussein. Paraphrasing the conversation, Aman remembered Reed saying, "It doesn't matter," and "It doesn't matter, he was in a bar in uniform," during the course of the call.

It was later revealed that the anonymous caller was a pilot employed by Trans World Airlines named Emmet Conrecode. Conrecode was staying at the Howard Johnson's hotel in St. Louis on September 13. He testified in this case that while he was in a bar at the hotel eating dinner, he observed a man walk into the bar wearing

a pilot's uniform. According to Conrecode, the man drank a beer at the bar, and when a television showed a replay of an aircraft hitting one of the World Trade Center towers, the man raised his beer "as in a salute and took a swig." The man eventually left the bar, and another pilot told Conrecode that he told the man to "get out of the bar in uniform." Conrecode said the man later returned with epaulets removed from his uniform, and that during this second visit to the bar, the man announced that he was going to fly an airplane the next day. Conrecode testified that he later inquired about the man's identity at the front desk of the hotel, and the desk manager identified him as a Trans States pilot named "Hussein."

Conrecode testified that he could not sleep that night, and he decided to contact the Federal Bureau of Investigation early in the morning of September 14. He left a message, and the FBI interviewed Conrecode later that day. Conrecode stated that he also contacted the airport police when he realized that the man he observed in the bar could gain access to an aircraft if flight operations resumed in the morning. He described to the duty officer "the behavior of a pilot in uniform drinking in a bar and reporting that he was going to be flying the next day and that he was acting in a strange manner." Conrecode further testified that he called Trans States Airlines on September 14 and spoke with a manager who left a meeting to take the telephone call. Conrecode recalled that he told the Trans States manager that Hussein had been drinking in a bar in uniform, and that he "seemed to be intimidating passengers by that action." Conrecode "may have" mentioned what he perceived as Hussein's support for the September 11 terrorists. Conrecode said he was not sure whether he identified himself to the Trans States manager.

Conrecode's report to law enforcement prompted an investigation by the FBI. According to the reports of an FBI agent and airport police officer who interviewed Hussein on September 14, Hussein admitted that he was wearing an epauletted white shirt and blue pants while drinking alcoholic beverages and eating dinner in a bar at the Howard Johnson's hotel. The officer and agent, respectively, reported that

Hussein acknowledged on September 14, 2001, that his attire in the bar did "identify him as a pilot" and was "indicative of a member of a flight crew." (Def.'s App. at 79, 145). Hussein testified in a deposition in 2004 that he was not wearing his uniform with epaulets on the shirt in the bar at Howard Johnson's, but he did not recall whether he had worn his uniform shirt and slacks in the bar. (Pls.' App. at 250). Hussein averred in a declaration that he never made any statement or gesture indicating that he approved of the terrorist attacks of September 11, and that he has always believed those acts were contemptible and horrific. Hussein testified that he was smiling while in the bar because he had learned earlier in the day that his wife was pregnant.

At some point after the FBI interviewed Conrecode, the FBI agent called Reed about Hussein. According to a report of Reed's interview in August 2002 with an interviewer from the EEOC, Reed said that he decided to terminate Hussein "since he had received this call" from the FBI and "since [Hussein] was already suspected of being in a drinking establishment." (Pls.' App. at 112). Reed testified at his deposition in 2004, however, that he received the call from the FBI agent after he made his decision to terminate Hussein.

On October 5, 2001, Hussein filed an initial questionnaire with the EEOC regarding his discharge, and filed a charge of discrimination in violation of Title VII with the EEOC on December 10. After an investigation, the EEOC determined that Trans States violated Title VII by terminating Hussein on account of his religion, race, or national origin. The parties entered conciliation discussions, but could not reach a settlement, and the EEOC filed this action, in which Hussein subsequently intervened as a plaintiff.

Trans States moved for summary judgment on all counts. In granting the motion, the district court found that Hussein had provided no "evidence that [Trans States] fabricated the telephone call" from Conrecode to Reed. The court also found

that because of his probationary status, Hussein was not entitled to certain disciplinary procedures established by the collective bargaining agreement and employee handbook. The court further concluded that similarly-situated probationary pilots had been treated in the same way as Hussein, that Hussein provided no evidence that his religion, race, or national origin influenced Reed's termination decision, and that without more, the timing of Hussein's termination in relation to the September 11 terrorist attacks could not support a finding that Trans States's explanation for his termination was a pretext for discrimination.

Trans States also moved for attorneys' fees pursuant to 28 U.S.C. § 1927 and 42 U.S.C. § 2000e-5(k), arguing that plaintiffs frivolously and vexatiously proceeded with this action, and that the EEOC did not satisfy its duty to conciliate in good faith. The court found that although plaintiffs' claims were meritless, they were not "frivolous or groundless." The court also found that the EEOC conciliated in good faith. Accordingly, the court denied Trans States's motion for attorneys' fees.

## II.

The EEOC and Hussein appeal the district court's grant of summary judgment in favor of Trans States on the plaintiffs' claims under Title VII and the Missouri Human Rights Act. Summary judgment is appropriate if, considering all reasonable inferences from the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Hitt v. Harsco Corp.*, 356 F.3d 920, 923-24 (8th Cir. 2004). We review *de novo* the district court's grant of a motion for summary judgment.

A plaintiff raising claims of employment discrimination may survive a motion for summary judgment either by proof of "direct evidence" of discrimination, or by creating the requisite inference of unlawful discrimination through the burden-shifting

framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Griffith v. City of Des Moines*, 387 F.3d 733, 735-36 (8th Cir. 2004); *Finley v. Empiregas, Inc.*, 975 F.2d 467, 473 (8th Cir. 1992) (applying Title VII framework to claims under Missouri Human Rights Act). There is no evidence that Reed or others at Trans State made statements evidencing hostility to persons of the Islamic faith or persons of Hussein's race, religion, or national origin. The EEOC and Hussein rely on circumstantial evidence, including the timing of the termination, inferences to be drawn from Hussein's name, Reed's explanations for the termination, and an alleged deviation from progressive discipline procedures outlined in an employee handbook, to support their contention that Trans States acted with an unlawful motive. This circumstantial evidence is not the sort of strong evidence "showing a specific link between the alleged discriminatory animus and the challenged decision" that would support a finding of illegal discrimination under the "direct evidence" approach. *See Griffith*, 387 F.3d at 736 (internal quotation omitted). We therefore consider the claims under the *McDonnell Douglas* framework.

Because the record was fully developed on motions for summary judgment, we may turn to the ultimate question of discrimination *vel non*. *See Riser v. Target Corp.*, No. 05-4147, 2006 WL 2370475, at *3 (8th Cir. Aug. 17, 2006); *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005). Trans States articulated a legitimate, non-discriminatory explanation for terminating Hussein, namely, that on the evening of September 13, Hussein violated company policy by entering a hotel bar while in uniform. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc) (violating company policies is a legitimate reason for termination). Whether Hussein actually violated the company policy by appearing in the bar in uniform is not dispositive. The relevant question is whether the Plaintiffs can show that Trans States was motivated by discriminatory animus, rather than solely by its *belief* that Hussein violated company policy. *See Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000). The plaintiffs have the burden to show that the

company's legitimate explanation was a pretext for illegal discrimination. *Griffith*, 387 F.3d at 735-36.

In support of their contention that the evidence shows unlawful discrimination based on race, religion, and national origin, the plaintiffs contend that Reed must have assumed that a pilot named "Mohammed Hussein" was Muslim and Arab. Hussein says "a fact finder would have to ignore common sense to conclude that Reed made no connection between the name Mohammed Hussein and being Muslim and Arab." (Hussein Br. at 28). Similarly, the EEOC says "[t]hat a person would not connect the name Mohammed Hussein with being Muslim and Arab defies belief." (EEOC Br. at 54).

It is undisputed, however, that Hussein is *not* Arab. He is of Indian descent. (EEOC Br. at 3). Plaintiffs' argument, therefore, is that it would "defy belief" and "ignore common sense" for a jury to conclude that Reed may *accurately* have declined to assume that a person with Hussein's name must be of Arabic descent. The contention that a jury necessarily would infer that Reed engaged in inaccurate stereotyping is not attractive. And assuming *arguendo* that a non-Arab might have an actionable claim under Title VII based on race or national origin if his "objective appearance to others" was as an Arab, *cf. Bennun v. Rutgers State Univ.*, 941 F.2d 154, 173 (3d Cir. 1991), there is no evidence that Reed ever observed Hussein. (Pl.s' App. at 235, 443). The asserted inference that a person named "Mohammed Hussein" would follow the Islamic faith is at least consistent with the facts of this case, although we think it is generally understood that most persons are named at birth by their parents, but develop their religious beliefs over a lifetime. As Reed testified, "there's Jewish names that are Christians and there's Muslim names that are Arabic names that aren't Muslim." (Pls.' App. at 413). There is no evidence that Reed was informed of Hussein's race, religion, or national origin, or that he commented about them. Reed testified that he never thought about Hussein's religion, and the inference that he

assumed it and then considered it in making the employment determination is rather tenuous.

But assuming for the sake of argument that a reasonable jury could find that Reed inferred that Hussein was Muslim or Arab at the time of the employment decision, we turn to the plaintiffs' attack on the airline's legitimate non-discriminatory for the termination. Their principal contention is that Reed's explanation – that he dismissed Hussein based on an anonymous telephone call, without any investigation of the claims of misconduct – is inherently incredible. They argue that a jury reasonably could conclude that Hussein was terminated in a precipitous manner for the alleged infraction only because the incident occurred shortly after the September 11 attacks and Reed believed that Hussein – like the attackers – was Muslim. They seek to bolster this theory with contentions that Trans States varied from company policies and procedures calling for progressive discipline, and that other probationary employees received more lenient treatment under similar circumstances. They also rely on variations in Reed's explanation for the sequence of events leading to the termination.

We are not persuaded that these arguments based on circumstantial evidence are sufficient to support a finding of intentional discrimination. First, the disciplinary policies and procedures adopted by Trans States do not support an inference of discrimination. Plaintiffs point to Trans States's employee handbook, which states that a system of "progressive discipline" will be used when employees violate company procedures or rules. The handbook does not distinguish between probationary and non-probationary employees, so Plaintiffs contend that the failure to afford Hussein an opportunity for progressive discipline suggests that Reed was motivated by unlawful considerations. But the collective bargaining agreement between Trans States and the airline's pilots includes a subsection regarding "Discipline and Discharge," which specifically provides that "[n]othing in this agreement shall be construed as extending the rights of [that subsection] to a pilot

during his probationary period." The rights that are not extended to a probationary pilot include a prohibition on discharge "without just cause," a right to present information concerning a potential disciplinary matter, and the right to notice of the facts on which discipline is based. It is undisputed that if the Employee Handbook and the CBA conflict, then the CBA controls. To the extent that the Employee Handbook grants a probationary pilot a right to "progressive discipline," it conflicts with the CBA, for it would undermine the express provision of the CBA that declines to require even "just cause" or "notice" before a probationer is discharged. Trans States, therefore, did not violate its policies and procedures by terminating Hussein, rather than imposing a lesser sanction, and by discharging him without notice and an opportunity to be heard.

Second, Plaintiffs have not demonstrated that similarly-situated probationary pilots have received more favorable treatment from Reed than did Hussein. To establish that a similarly-situated employee received more favorable treatment, the evidence must show that the similarly-situated employee "dealt with the same supervisor, [was] subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004) (internal quotation omitted). Reed testified that in 1999, he terminated probationary pilots "on the spot" after he received an anonymous call informing him that several pilots were seen drinking in a bar after a training exercise in South Bend, Indiana.

Plaintiffs attack Reed's explanation of the South Bend incident based on the testimony of a pilot, Lionel Purnwasy, who participated in the training exercise. Purnwasy testified that he heard it rumored after the trip that two probationary pilots and one non-probationary pilot were fired "[w]ithin a week" of the anonymous call, (Pls.' App. at 373, 383-84), and Plaintiffs allege that the timing suggests that Reed conducted a more thorough investigation than he did for Hussein, whom he decided to fire almost immediately after he received Conrecode's call. We disagree that this

"rumor" conflicts with Reed's testimony. Reed acknowledged that he conducted a brief investigation into the conduct of non-probationary pilots who were fired as a result of that incident, so a statement that all of the pilots – probationary and non-probationary – were fired "within a week" does not conflict with Reed's testimony that the probationary pilots were terminated immediately, while the non-probationary pilots were terminated shortly thereafter.

Nor does a discrepancy between the testimony of Reed and Purnwasy about the numbers of pilots involved create a genuine issue of material fact. Reed recalled that six or eight pilots were involved in the training exercise, and that all of them were terminated for drinking. Purnwasy said 12 to 16 pilots were in South Bend at the bar, but only three were drinking and eventually terminated. Plaintiffs contend that Purnwasy's version supports an inference that Reed must have investigated the allegations in the South Bend case to determine which pilots should be terminated, and that the South Bend probationary pilots thus received more process than Hussein. But Reed testified that the anonymous caller in the South Bend incident did not provide the names of the pilots involved, so to the extent Purnwasy is correct that not all pilots were terminated, his version of events implies only that Reed was required to make some inquiry to determine the names of the pilots who were allegedly drinking at the bar. Purnwasy's explanation does not contradict Reed's testimony that he acted to terminate the probationary pilots as soon as they were identified as drinking in the bar.

The EEOC suggests that the pilots in South Bend were not similarly situated to Hussein, because they committed a more serious violation (drinking within 12 hours of reporting to duty), and that a jury could reject the airline's contention that the South Bend incident demonstrates that other probationary pilots were treated like Hussein. But the burden is on the plaintiffs to show that similarly-situated employees were treated differently in order to make a showing of pretext. *Cherry*, 361 F.3d at 479.

Absent a showing that the South Bend probationary pilots were treated more favorably than Hussein, the evidence does not support the plaintiffs' claim.

Third, we reject the suggestion that because other Trans States managers may have afforded probationary pilots more process than Reed gave to Hussein, this tends to show that Reed was motivated by race, religion, or national origin. The EEOC points to testimony suggesting that if supervisors other than Reed had been responsible for addressing the anonymous call about Hussein, they may have investigated the identity of the accuser and the facts of the incident before making the decision to terminate employment. This evidence, however, neither undermines Reed's testimony that he treated Hussein as he treated other probationary pilots, nor shows that Reed's treatment of probationary employees is inconsistent with Trans States's disciplinary policies and procedures, as set forth above. That a different manager may have exercised his discretion to handle the situation differently does not support a finding that Reed acted based on an impermissible motive.

Fourth, we do not think Reed's allegedly "shifting explanations" for the decision to terminate Hussein reasonably support an inference of unlawful motive. Reed testified in his deposition that he decided to terminate Hussein because of information from the anonymous call that Hussein was in a bar in uniform, after he received confirmation from flight managers that Hussein was in St. Louis at the time. The EEOC investigation report from 2002 states that Reed also relied on a telephone call from the FBI about Hussein when he made the decision to discharge Hussein without further investigation. The EEOC report quotes Reed as stating that he had decided to conduct an investigation of the incident, but then called it off when he heard from the FBI.

This conflicting testimony is different from the type of "shifting explanation" that we have said would give rise to an inference of pretext. *See, e.g.*, *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998); *Briscoe v. Fred's*

*Dollar Store, Inc.*, 24 F.3d 1026, 1027-28 (8th Cir. 1994); *see also EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994). In *Young*, *Briscoe*, and *Ethan Allen*, the employers gave two completely different explanations for their decisions to terminate their employees, and such a substantial change in position supported an inference of pretext. *Young*, 152 F.3d at 1024; *Briscoe*, 24 F.3d at 1027-28; *Ethan Allen*, 44 F.3d at 120. Trans States, by comparison, has not wavered from its one explanation for terminating Hussein – that Hussein appeared in a bar while in uniform. Reed has offered inconsistent explanations for precisely what convinced him to act based on the anonymous accusations, telling the EEOC that the FBI's call corroborated the story for him, but testifying in deposition that he considered the call adequately corroborated when Swoboda informed him that Hussein was based in St. Louis and was not scheduled to be out of town. Nonetheless, we do not view this discrepancy as bearing on a material fact in dispute. Either way, the airline terminated Hussein for violation of its rule, and we think the distinctions in testimony about what convinced Reed to rely on the information are simply too fine to constitute substantial evidence of pretext.

Finally, we are not persuaded that this case should be submitted to a jury simply on the theory that Reed's explanation for his termination of Hussein is "inherently incredible." Credibility questions, to be sure, are for resolution by a finder of fact, but at least where an employer's legitimate, non-discriminatory reason is not truly fanciful, there must be some positive evidence to rebut the employer's explanation and create a genuine dispute about credibility. "[T]he simple fact that the employer's testimony is necessarily self-interested" is not "enough under our previous cases to allow the jury to find that the employer's proffered reasons were pretextual." *Nelson v. J.C. Penney, Co.*, 75 F.3d 343, 346 (8th Cir. 1996). Given the appropriately heightened concern in the airline industry about avoiding any public connection between pilots and alcohol, and the specific provisions negotiated by Trans States to allow dismissal of probationary pilots without any notice or cause, we do not believe that Reed's testimony about a quick decision to terminate Hussein is the sort of

"obviously contrived" explanation that might on its own permit an inference that race, religion, or national origin was a motivating factor in Hussein's termination. *Id*. We therefore uphold the district court's decision to grant summary judgment in favor of Trans States.

## III.

Trans States appeals the district court's denial of attorneys' fees under both 42 U.S.C. § 2000e-5(k) and 28 U.S.C. § 1927. We review the court's denial of attorneys' fees for an abuse of discretion. 42 U.S.C. § 2000e-5(k); *Am. Fed'n of Musicians, Local 2-197 v. St. Louis Symphony Soc'y*, 203 F.3d 1079, 1081 (8th Cir. 2000). A district court may award attorneys' fees to a prevailing defendant in a Title VII action upon finding that the action was "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith," *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978), and may order reimbursement of fees pursuant to 28 U.S.C. § 1927 when an attorney's conduct multiplies the proceedings unreasonably and vexatiously, and, when "viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." *Tenkku v. Normandy Bank*, 348 F.3d 737, 743 (8th Cir. 2003) (internal quotation omitted); *see also Buchanan v. United Parcel Serv., Inc.*, No. 05-3215, 2006 WL 2404040, at *5 (8th Cir. Aug. 22, 2006). This court considers many employment discrimination claims that ultimately are held to be without merit, and this case is not materially different from many of those. The plaintiffs had a colorable argument in support of their claims, and the district court did not abuse its discretion in denying reimbursement of attorney's fees under Title VII or § 1927.

Trans States also argues that the district court abused its discretion by declining to order reimbursement of attorneys' fees based on the EEOC's failure to satisfy its obligation to conciliate. The EEOC may bring a direct suit against an employer only after it has attempted to conciliate in good faith but failed to reach an agreement. 42

-14-

U.S.C. § 2000e-5(f)(1); *Johnson v. Nekoosa-Edwards Paper Co.*, 558 F.2d 841, 848 (8th Cir. 1977). In this case, after each party offered settlement terms, the EEOC requested a settlement offer that included back pay. In a letter dated June 16, 2003, the EEOC asked for a further reply by June 20, 2003, absent which the agency would consider conciliation a failure. Before Trans States had an opportunity to calculate back pay and submit a counteroffer, however, the EEOC determined on June 18, 2003, that conciliation efforts had failed and filed this suit. We are troubled by the EEOC's failure to adhere to its own deadline of June 20 before declaring that conciliation had failed. But it is true that the parties agreed throughout negotiations that they were far apart on the terms of a settlement, and it does not appear that there was a reasonable prospect of settlement when the EEOC declared that conciliation efforts were unsuccessful. Accordingly, we cannot say that the district court abused its discretion in denying Trans States' motion for attorneys' fees.

\* \* \*

The judgment of the district court is affirmed.

_____