# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-2536

_____

Nasrin Fatemi

*Plaintiff - Appellant*

v.

Charles White, in his Official Capacity; James Clardy, in his official and personal capacity; Debra Fiser, in her official and personal capacity; John Day, individually and in his official capacity; University of Arkansas System; Hosea Long, in his Official Capacity

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 8, 2014
Filed: January 6, 2015

_____

Before RILEY, Chief Judge, SMITH and KELLY, Circuit Judges.

_____

SMITH, Circuit Judge.

The University of Arkansas for Medical Sciences (UAMS) terminated Dr. Nasrin Fatemi, a female second-year neurosurgery resident, from its program. Dr. Fatemi sued UAMS and several of its employees (collectively, "defendants"),

asserting, among other things, gender discrimination. The district court[1] granted summary judgment in favor of the defendants, and Dr. Fatemi appeals. We affirm.

## I. *Background*[2]

The UAMS College of Medicine sponsors nine core residency programs, including neurosurgery. Each program is housed in a clinical department under the direction of a program director and the department chair. Generally, a neurosurgery residency includes seven years of post-medical school education. The first year of a neurosurgery residency is designated the "Post-Graduate Year 1" (PGY-1), and the final year is designated the PGY-7.

Dr. T. Glenn Pait became the Interim Chair of the UAMS Department of Neurosurgery ("Department") in late 2009, and Dr. Dennis McDonnell became the Interim Residency Program Director in late 2009. Dr. Pait and Dr. McDonnell served in their respective roles until Dr. John D. Day began his tenure as Department Chair and Residency Program Director in April 2010.

In January 2010, Dr. Pait hired Dr. Fatemi as a PGY-2 and Dr. Monir Tabbosha as a PGY-3. Both started working at UAMS on January 22, 2010. Dr. Fatemi was the only female neurosurgery resident during her tenure at UAMS. According to Dr. Fatemi, on her first day of training, Dr. Igor DeCastro, the Chief Resident, informed

---

[1]The Honorable D. Price Marshall, United States District Judge for the Eastern District of Arkansas.

[2]As the district court noted, "[t]he summary-judgment papers [in this case] are voluminous—hundreds and hundreds of pages of record materials and briefs." Like the district court, we have studied the entire record in crafting the factual background. Where the parties dispute certain facts or recount events differently, we have so indicated. As Federal Rule of Civil Procedure 56 sets forth, only a "genuine dispute as to any *material* fact" precludes summary judgment. Fed. R. Civ. P. 56(a) (emphasis added). We will address whether the factual disputes are "material" in Part II, *infra*.

Dr. Fatemi that she "should follow Dr. [Gautam] Gandhi, a first year intern around, and that was how [she] would be trained." Both Dr. Fatemi and Dr. Gandhi were considered junior-level residents. Dr. Gandhi, a PGY-1, had been with the Department since July 2009 and had attended both graduate school and medical school at UAMS; thus, he was very familiar with the campus and computer systems. Although Dr. Gandhi does not recall anybody at UAMS specifically telling him to aid Dr. Fatemi in her transition, he testified that his perceived "role . . . was to help her transition" by showing her around the campus. Dr. Gandhi also testified that, like Dr. Fatemi, he also oriented Dr. Tabbosha.

According to Dr. Pait, complaints about Dr. Fatemi occurred within the first month of her participation in the program. Dr. Fatemi testified that she "had a feeling" from the first week in February that Dr. Pait did not want her in the program. In any event, the undisputed facts show a series of problems arising between Dr. Fatemi and other neurological program residents and coworkers at the inception of her tenure at UAMS. First, Dr. Gandhi testified that very soon after Dr. Fatemi started at UAMS an incident occurred in which she began "yelling to the point where she was just screaming at the top of her head in the emergency room directly at [Dr. Gandhi]." Dr. Gandhi was frightened and embarrassed by the situation. Dr. Fatemi admits the incident, but she denies that she screamed.

Second, Dr. Fatemi had problems with Dr. DeCastro. Dr. Fatemi stated that "[w]ithin a week or so of being in the program" she informed Dr. DeCastro about her concern of gender discrimination. According to Dr. Fatemi, "[a] week or so after" her arrival, Dr. DeCastro directed her to "accompany him to the operating room to put in a 'shunt.'" Dr. DeCastro advised Dr. Gandhi to do the procedure, while Dr. Fatemi observed. After the surgery, Dr. Fatemi told Dr. DeCastro that she "was concerned that as a woman that [she] was not going to be allowed to do surgeries and that [she] would be taken out of the program because [she] had not gained the requisite

-3-

experience." She asked that she be "treated in accordance with [her] rank and position within the program and not as a brand new doctor."

After Dr. Fatemi complained to Dr. DeCastro about gender discrimination, Dr. DeCastro insisted that a third party be present when he spoke with Dr. Fatemi. He told Dr. Fatemi that Dr. Pait and UAMS's attorney directed him to have the third-party witness present. Dr. Fatemi claims that "Dr. DeCastro made sure that the other residents would be wary of me." Dr. DeCastro testified that he did not tell the other residents that Dr. Fatemi claimed gender discrimination; instead, he told them only to have a third party present for meetings with Dr. Fatemi.

Dr. DeCastro recounted an incident in which he instructed Dr. Fatemi that it was her day to go to the operating room (OR), but she failed to do so. According to Dr. DeCastro, Dr. Baraa Al Hafez reported to Dr. DeCastro that Dr. Fatemi told Dr. Al Hafez that Dr. DeCastro had instructed her to leave the OR. Dr. DeCastro responded, "No, no, I told her the opposite, I told her today's the day she needs to go to the OR. No, I told her to stay in the OR[;] I don't understand why she had to leave." Dr. DeCastro testified that he was unable to trust Dr. Fatemi anymore after this incident.

Third, in early February 2010 and again in late February 2010, Ashley Lumpkin, Administrative Coordinator of Health Information Management at UAMS, emailed Dr. Fatemi about her failure to comply with regulatory standards that require a complete history and physical evaluation in the medical record prior to surgery or within 24 hours of admission within the electronic medical record.[3]

_____

[3]Lumpkin sent a February 10, 2010 email directly to Dr. Fatemi and copied Dr. Pait on the email. Lumpkin sent a February 27, 2010 email to Dr. Gandhi, advising him that regulatory standards had not been satisfied. She copied Dr. Pait on that email. Dr. Gandhi responded to the email (and copied Dr. Pait to his response), requesting that Lumpkin send the email to Dr. Fatemi because "[s]he did the preop

Fourth, in his declaration, Dr. Pait maintains that in early February 2010,[4] Dr. Fatemi asked him to come to the emergency room to see a patient with an acute subdural hematoma. Dr. Pait asserts that Dr. Fatemi should have consulted with the patient's family and considered him a candidate for the OR. According to Dr. Pait, when he arrived, Dr. Fatemi had not consulted with the patient's family or prepared him for the OR. Dr. Pait contends that Dr. Fatemi told him that the patient was brain dead but that Dr. Pait's physical examination of the patient did not support brain death. Dr. Pait spoke with the patient's family, and they wanted everything done for their loved one. Blood tests revealed that the patient needed Vitamin K, plasma, and 14,000 units of Factor VII, a clotting agent. Dr. Pait requested that the patient be moved immediately to the OR. Dr. Pait began the surgery when the clotting agents were administered. Dr. Pait testified that Dr. Fatemi, as a PGY-2, should have known to assess the patient properly, consult with his family, and prepare him for the OR to avoid wasting critical time. Dr. Fatemi did not stay for the operation; instead, she left the OR.

Dr. Fatemi asserts that Dr. Pait's allegation that she erroneously diagnosed the patient as being brain dead is untrue and unsupported by her own "Consult Note," which never uses that term.

Fifth, on February 20, 2010, Dr. McDonnell documented problems with Dr. Fatemi's performance during surgery on a patient with a gunshot wound. Dr. McDonnell stated that Dr. Fatemi was eager to perform the surgery but unfamiliar

for this patient."

[4]According to Dr. Pait, the date of the incident in question was February 2, 2010. Dr. Fatemi claims that the date of the incident was February 8, 2010. Dr. Pait's "Attending Note," Dr. Fatemi's "Consult Note," the "Operative Report," the record of surgeries performed during the relevant period, and the February call schedule all support a finding that the date was February 8, 2010. The date of the incident, however, is not a material fact.

with the basic skills required to do so. He concluded, "[T]his experience indicates to me that Dr. Fatemi is very inexperienced and probably has not had any direct surgical experience in performing cranial procedures."

When asked why he permitted Dr. Fatemi, a resident who had "only been in the program for a couple weeks," to perform the surgery while he assisted, Dr. McDonnell explained that "when an attending assists a resident, the resident's hands have to be involved with doing the procedure, but the attending is there to make sure that it's done safely. [Dr. McDonnell] had confidence that Dr. Fatemi would be able to do the procedure with [him] being there to make sure it was done properly." Prior to the surgery, Dr. McDonnell believed Dr. Fatemi to be "competent" and "thought it would be safe for her to do [the surgery], and she would benefit from the experience." According to Dr. McDonnell, he would not have permitted Dr. Fatemi to perform the surgery unless he thought she could competently perform it.

According to Dr. McDonnell, as well as other faculty members, this craniotomy was a procedure that should have been familiar to a resident at Dr. Fatemi's level. Dr. McDonnell testified that while he does not normally write a memorandum documenting his experience with a resident, he "thought it would be important to document this [experience]." Dr. McDonnell stated that "Dr. Fatemi was not performing at the level that we expected that she would be performing. And so we needed to document that." Dr. McDonnell "considered [Dr. Fatemi] inexperienced and at the basic beginner level." Although Dr. McDonnell wanted Dr. Fatemi to succeed, he felt it necessary to document the surgical experience because she was "performing at a level that is unacceptable." In summary, Dr. McDonnell's testimony reflects his belief that Dr. Fatemi was not performing at the PGY-2 level. Dr. Fatemi counters that Dr. McDonnell's "documentation" of purported problems with her performance is actually UAMS's attempt "to create documentation to justify her termination—because she had complained of gender discrimination."

On February 23, 2010, Dr. McDonnell; Dr. Pait; and Amy Keeland, the Department's Residency Program Coordinator and Executive Assistant to the Chair, met with Dr. Fatemi. Dr. Pait's written record of the February 23, 2010 meeting provides as follows:

Dennis McDonnell, MD, Amy Keeland and I (T. Glenn Pait, MD) met with Dr. Nasrin Fatemi on 23 February 2010. We asked her if there was anything that we could do to help her, as she has completed approximately a month of training at UAMS. She has received the Resident Curriculum Guidelines for Neurosurgery. We asked her how the transition was coming and how she was adapting. She has some concerns in regards to how things are done here, as compared to her previous environment. She expressed her concern on several topics. She also expressed concerns about "not being welcomed here" and mentioned topics of concerns: rounds in the morning, interactions with residents. She had an opportunity to discuss each of these items in-depth.

Again, we discussed with her growth, development and requirements for her Neurosurgical training at UAMS. We offered support and any guidance she may need. To address her concerns in regards to interactions and "not being welcomed[,"] we will investigate this issue with her colleagues/fellow residents. She had an opportunity to discuss issues, ask questions, and her questions were answered.

At her deposition, Dr. Fatemi reviewed Dr. Pait's written record of the February 23, 2010 meeting and agreed that it is accurate, except she testified that (1) Keeland took notes, and (2) Dr. Fatemi believed that the meeting was disciplinary because no other residents were called to a meeting with Dr. Pait. She also asserts that she "told them that [she] felt there was a gender issue at the institution."

The complaints against Dr. Fatemi did not cease following the meeting. Just five days later, on February 28, 2010, Dr. Pait and Dr. DeCastro received an email

from Dr. Nancy Maalouf, a female UAMS neurology PGY-2 resident, complaining about Dr. Fatemi's unprofessional and disrespectful behavior the day prior. The email provides:

> I am one of the neurology residents who happened to be on call yesterday. I received a call from Dr. Nasrin Fatemi who was asking about a patient on the neurology service that neurosurgery was consulted on. She started asking, with a "commanding tone[,"] who read the brain imaging before consulting neurosurgery. After consulting with the resident who has been taking care of the patient, I answered that Dr. Keyrouz our attending ha[s] read it. She did not like the fact that we do not have an official neuroradiology reading before consulting her. Then she asked me, again with a "commanding tone[,"] to speak loud because she could not hear me. So I raised my voice and asked her whether she had any other questions for me. At that time she got upset why I was "shouting on her[."] She then asked me in a sarcastic way: "what's your name?" as if she was talking to an inferior creature and when I answered she hung up on me!!!
>
> I usually don't take such incidents personal[ly,] but after I mentioned this to some of the other neurology residents, I was told that many other residents have complained about Dr. Fatemi['s] behavior during the past month, especially that she hasn't been responding to consults and would not even pass them on to the next resident on call.
>
> I have never been impolite with other residents so I usually expect other fellow residents to be respectful when they call. Dr. Fatemi['s] behavior was rude and unprofessional[,] and I thought I should bring to your attention this repetitive pattern in her behavior with other services.

Dr. Fatemi rejects the email's veracity. She denies raising her voice during the incident and disputes Dr. Maalouf's contention that other residents had complained about her behavior. She also denies hanging up on Dr. Maalouf. According to Dr. Fatemi, no reports exist of any residents from any other services complaining about their interaction with her. Dr. Fatemi maintains that Dr. Maalouf's report that Dr.

Fatemi failed to respond to consults and to pass them on to other residents is "absolutely untrue."

After Dr. Pait and Dr. McDonnell's meeting with Dr. Fatemi on February 23, 2010, in which she expressed concern about interactions with other residents, Dr. McDonnell, Dr. Pait, and Keeland met with Dr. Gandhi on March 2, 2010, "to discuss the function of the neurosurgical service and his interactions with Dr. Nasrin Fatemi." Dr. Pait documented Dr. Gandhi's responses in a memorandum, which provides, in relevant part:

> [Dr. Gandhi] states that he has had a difficult time interacting with [Dr. Fatemi]; in fact, he has not spoken to her in approximately 14 days on the University neurosurgical service. He states that he attempted, upon her arrival, to discuss with her various aspects of the service and apparently was not well-received. He has great concerns and is somewhat "frightened" about the interaction with her. The lack of interaction and cooperation among residents on the neurosurgical service is of great concern. He understood.

Also on March 2, 2010, Dr. McDonnell, Dr. Pait, and Keeland met with Dr. Fatemi for a second time. According to Dr. Pait's memorandum, the meeting was to address "not only [Dr. Fatemi's] interactions with residents on the Neurosurgical services; but, other services." The memorandum provides that Dr. Pait discussed Dr. Maalouf's letter with Dr. Fatemi and the "great concern" over Dr. Fatemi's "inability to interact well" with others. Dr. Pait recorded that Dr. Fatemi was "unable to give a reason for this poor interaction." Dr. Pait's memorandum also states that Dr. McDonnell, Dr. Pait, and Keeland suggested that Dr. Fatemi take advantage of UAMS's Employee Assistance Program (EAP). According to the memorandum, Dr. Fatemi responded that "the poor interactions are because she's a woman." Dr. McDonnell, Dr. Pait, and Keeland then "discussed with [Dr. Fatemi that] such behavior cannot continue because of concerns about patient care; i.e., not completing

histories and physicals and not performing consultations when requested." They informed Dr. Fatemi that continued problems would lead to Dr. Fatemi being put on probation. According to Dr. Pait, he asked Dr. Fatemi "what we can do to help her," as a concern existed "about her being 'a good fit'" at UAMS. Dr. Fatemi responded that "she has not had problems before and the services where she was on previous occassions functioned differently." Dr. Pait noted in his memorandum that "this is the second meeting concerning a behavioral issue" and that Dr. Fatemi "fully understands the gravity of her current situation."

Dr. Fatemi disputes Dr. Pait's record of the March 2, 2010 meeting. She states that Dr. Pait was untruthful when he said that Dr. Fatemi was unable to give a reason for her poor interactions with other residents. She denies that Dr. Pait encouraged her to seek help through the EAP. She also denies that Dr. Pait told her that if she were put on probation, the probation notice would be in her record. She also denies being asked what could be done to help her. Dr. Fatemi testified that she felt the March 2, 2010 meeting was in retaliation against her for alleged complaints regarding sex discrimination.

On March 24, 2010, Dr. Pait received a telephone call from Dr. Tabbosha, the Acting Chief Resident while Dr. DeCastro was on leave, stating that Dr. Fatemi was assigned to surgery with Dr. M. Gazi Yasargil but had refused to go because Dr. Yasargil did not like her. As a result, Dr. DeCastro, who was taking vacation days to care for his sick father, was called in to assist Dr. Yasargil. Dr. Tabbosha sent Dr. Pait a follow-up email recounting these events on March 25, 2010. Dr. Fatemi asserts that Dr. Tabbosha's report was false and that no one ever asked her to assist Dr. Yasargil.

Thereafter, Dr. Pait assigned Dr. Fatemi to Arkansas Children's Hospital (ACH). According to Dr. Pait, although neurosurgery residents typically rotate through ACH in the more senior years of their residency, he "wanted to provide [Dr.] Fatemi with an opportunity to work in a different environment." He believed that

"ACH would maybe provide a better environment for her in the hope that at ACH [Dr. Fatemi] would have a fresh start." Dr. Pait spoke with Dr. Mark O'Brien, Chief of Pediatric Neurosurgery at ACH, and explained this to him. Dr. Fatemi asserts that she found out on March 29, 2010, that she was being assigned to ACH by looking at the April schedule. According to Dr. Fatemi, Dr. Pait did not tell her why he assigned her to ACH.

Dr. O'Brien testified that he spoke to Dr. Fatemi when she started at ACH. According to Dr. O'Brien he "told her . . . that [he] knew about some difficulties that went on at the university and that [he] considered that she would start with a clean slate at Children's, that [he] would not let that continue down here, down at Children's." Dr. Fatemi denies that any conversation occurred with Dr. O'Brien in which he expressed that she would begin with a clean slate.

On April 2, 2010, within days of Dr. Fatemi's start at ACH, Dr. O'Brien received a phone call and follow-up email from Julie Holmes, Team Leader on the 4B Adolescent Unit at ACH, regarding an incident where Dr. Fatemi was "arguing rather loudly with somebody on her cell phone" at the nurses' station. Holmes's email stated that Dr. Fatemi's "tone was angry and loud—she was telling the other party that someone was a liar" and advised that Dr. Fatemi "needs to become aware of the behavioral standards at ACH so that she will be well received in the future." Holmes testified that she had never met Dr. Fatemi before and had never, in 28 years as a nurse, lodged a similar complaint, but she felt the incident was so inappropriate that she was compelled to report it. Dr. Fatemi denies that she was yelling during this incident. However, she admits that after the call, a nurse asked her if she was okay and whether she wanted to sit down.

In addition to Holmes's report, Tara Johnson, a Registered Nurse (RN) at ACH, who did not know Dr. Fatemi prior to Dr. Fatemi's arrival at ACH, also complained about Dr. Fatemi. On April 2, 2010, Johnson wrote an email to Dr. O'Brien reporting

-11-

that Dr. Fatemi had breached a protocol that could have had serious health ramifications for an ACH patient. Johnson reported that she saw Dr. Fatemi enter the room of a patient suffering from a serious infection. Because of the severity of the infection, the room was clearly marked for infection-control purposes, and the patient was in isolation. Dr. Fatemi entered the room to obtain a cerebral spinal fluid specimen and, thus, should have taken standard precautions, such as washing, putting a gown and gloves on, drawing the specimen, removing her gloves and gown, and washing again before exiting the room. Instead, Dr. Fatemi entered the room, exited without doing the draw, worked on charts for at least 15 minutes, re-entered the patient's room with the same gloves, obtained the specimen, went back to the nurses' station, and wrote on another chart while wearing the original gloves. Johnson testified that

> Dr. Fatemi's procedures were so egregious in my eyes that I wrote Dr. O'Brien regarding the fact that we had a severe infection control problem on our hands. In all my eight years as a nurse at ACH, I have only written one other note or e-mail of this variety regarding a resident physician's medical treatment of a patient.

Fatemi denies these allegations.

Dr. O'Brien confronted Dr. Fatemi while she was still at ACH and testified that Dr. Fatemi acted as if she did nothing wrong, was in denial, and was projecting blame onto others. He forwarded the emails of Holmes and Johnson to Dr. Pait the same day with a cover letter expressing his concern about the issues raised. Dr. O'Brien requested that Dr. Fatemi be reassigned to UAMS and asked that she not return for a rotation at ACH. Dr. Fatemi received notification on April 3, 2010, that she was not to return to ACH.

On April 1, 2010, while Dr. Fatemi was at ACH, Dr. Day had begun his tenure as the new Department Chair. Dr. Pait was aware that Dr. Day was reviewing the

residents' personnel files. Dr. Day testified that, shortly after his arrival at UAMS, he learned that Dr. Fatemi "had accumulated a number of complaints in her personnel file," the most recent of which was Dr. O'Brien's complaint about "Dr. Fatemi's disruptive and unprofessional behavior and from Dr. Fatemi's patient[-]safety and infection[-]control violation."[5]

Dr. Day testified that "[p]rior to Dr. O'Brien's complaint, Dr. Fatemi had only been in the program for two months, yet she had had trouble in both her interpersonal relationships with other residents and clinical staff at UAMS and ACH and her technical skills in the operating room." Dr. Day expressed concern "because [he] had never seen a resident file with so many complaints, much less a file with such an accumulation of complaints within two months." According to Dr. Day, he spoke with Dr. Pait and Dr. McDonnell about Dr. Fatemi's lack of performance and behavioral issues.[6] He testified that they were concerned about Dr. Fatemi's ability to successfully complete the residency program. Thereafter, Dr. Day conferred with Dr. James Clardy, the Associate Dean for Graduate Medical Education (GME), about disciplinary options and appropriate procedure. Pursuant to UAMS policy, Dr. Clardy

---

[5]In addition to Dr. O'Brien's complaint, the other complaints that Dr. Day referenced are (1) Lumpkin's emails to Dr. Fatemi about her failure to comply with regulatory standards, (2) Dr. McDonnell's documented problems with Dr. Fatemi's performance during surgery on a patient with a gunshot wound, (3) Dr. Maalouf's complaint about Dr. Fatemi's unprofessional and disrespectful behavior during a patient consult, and (4) Dr. Tabbosha's email to Dr. Pait regarding Dr. Fatemi's refusal to assist Dr. Yasargil in a surgery.

[6]Dr. Fatemi argues that Dr. Pait testified in his deposition that he does not recall discussing the residents with Dr. Day when he took over. A review of Dr. Pait's deposition reveals that Dr. Pait testified that he "d[id] not recall" whether he "s[at] down with [Dr. Day] and g[a]ve him sort of a breakdown of [Dr. Pait's] opinion *of each of the residents*." (Emphasis added.) Thus, Dr. Pait's deposition testimony does not contradict Dr. Day's testimony that he discussed *Dr. Fatemi*, as opposed to "each of the residents," with Dr. Pait and Dr. McDonnell.

advised Dr. Day that he could put Dr. Fatemi on probation and give her an opportunity to improve her deficiencies.

On April 6, 2010, Dr. Day and Dr. Pait met with Dr. Fatemi to place her on probation. According to Dr. Day, he and Dr. Pait discussed with Dr. Fatemi the most recent complaints from ACH and her failure to improve her behavior. Dr. Fatemi denied the ACH incidents. Dr. Day, however, testified that he "had no reason to disbelieve the ACH nurses or Dr. O'Brien." Dr. Day also testified that he and Dr. Pait discussed with Dr. Fatemi "the multiple instances of her unprofessional interactions with fellow UAMS residents both within and outside of the Neurosurgery Department."[7] Dr. Fatemi denies any responsibility or difficulties working with others. According to Dr. Fatemi, she "was not permitted to explain [her] point of view or even to respond to the accusations" during the meeting.

Dr. Day placed Dr. Fatemi on a six-week probation, informing "her that she must correct her behavior, drastically improve her professionalism, and attend counseling sessions with the [EAP]." Dr. Day also explained to Dr. Fatemi that at the end of the probationary period, he would reevaluate her performance. Dr. Day believed that Dr. Fatemi understood that if she failed to make sufficient progress or if any new issues or incidents arose, Dr. Day would immediately dismiss her from the UAMS neurosurgery program.

Dr. Day wrote to Dr. Fatemi on April 6, 2010, reiterating the content of the meeting and confirming that she was on probation; the probationary letter states:

---

[7]Dr. Fatemi objects to Dr. Day's use of the phrase "multiple instances" of unprofessional conduct, arguing that she had issues with Dr. Tabbosha, Dr. Gandhi, and Dr. Maalouf. But, in addition to those complaints against Dr. Fatemi, the documentation in the record shows complaints by Lumpkin, Dr. McDonnell, and Dr. O'Brien. *See* n.5, *supra*.

-14-

This afternoon you met with myself, Dr. T. Glenn Pait, and Amy Keeland to discuss your situation in our neurosurgical residency program. As we indicated to you, there have been multiple complaints regarding your behavior and professionalism both at UAMS and [ACH] from multiple physicians and staff. We discussed with you the specifics of these complaints and that we consider these behaviors to be inconsistent with the standards of our program. At this point you have failed to meet the behavioral standards that are expected in order to adequately function on the neurosurgery service. We also discussed incidents involving you that could have directly affected patient care and safety. Actions along these lines cannot be tolerated.

We have placed you on probation at this time and will reevaluate your progress with remedial counseling that was mandated in five weeks time. If you have not made sufficient progress with these behavioral and professionalism issues or if any new issues or incidents arise in the meantime, then I will move to dismiss you immediately from the neurosurgical residency program here at UAMS.

It is regrettable that this step has been taken but your actions have left us little choice. Our primary concern is for the safety and well-being of our patients. Unprofessional conduct is not only a behavioral issue but also a patient safety issue and we therefore take this very seriously.

On April 9, 2010, Dr. Day emailed Dr. Clardy to advise him that he had placed Dr. Fatemi on probation. He advised Dr. Clardy that he wanted to hold Dr. Fatemi's contract for the following year so that Dr. Day would have the option of not renewing it. Dr. Clardy responded that a consult with legal counsel was necessary "if we get close to letting her go." He instructed Dr. Day to "closely follow the policy" and stated that Dr. Day's "judgment will not be questioned, but the due process could be in an appeal process unless we go by the policy. Then you get stuck with a resident that you tried to let go and can't." Dr. Clardy offered to help Dr. Day with the process, as "it is time effective to stay out of trouble."

On Saturday, April 10, 2010, Dr. Debra Fiser, Dean of the UAMS College of Medicine, received an email from Dr. Fatemi stating that, as the only female resident in the UAMS neurosurgery program, she felt she was being isolated, treated unfairly, and harassed and that she did not feel safe. Dr. Fiser responded to the email within an hour of receiving it and told Dr. Fatemi that she needed more information. Because Dr. Fiser was out of town at the time, she instructed Dr. Clardy to contact Dr. Fatemi to follow up on her complaints. From the email communication that continued over the next several days, Dr. Fiser understood that Dr. Clardy met with Dr. Fatemi and followed up on her complaints by contacting the Department. Dr. Fiser trusted Dr. Clardy, one of her designees as an Associate Dean, to investigate Dr. Fatemi's complaints and to keep her informed of his progress and the results of his investigation.

Dr. Clardy also received Dr. Fatemi's email of April 10, 2010. Upon Dr. Fiser's instruction, Dr. Clardy emailed Dr. Fatemi to schedule a time for them to meet and discuss her complaints. Dr. Clardy and Dr. Fatemi met on Monday, April 12, 2010. Dr. Clardy took handwritten notes outlining Dr. Fatemi's complaints. Dr. Clardy testified that he had difficulty "get[ting] in a word." And, he stated that he "was struck by how she did not seem to be interested in improving relations with her fellow residents or the faculty." According to Dr. Clardy, Dr. Fatemi "gave no indication that she needed or was willing to change any behaviors. She wanted [Dr. Clardy] to investigate what was wrong with all of the individuals who complained about her."

Dr. Fatemi recalls being "very distraught" and "very upset and emotional" during the meeting in light of her probation placement just days prior to the meeting. She confirmed that "Dr. Clardy hardly said anything during the meeting" and stated that he "appeared to be unfamiliar with the issues and background."

After the meeting, Dr. Fatemi forwarded Dr. Clardy a copy of her probation letter. According to Dr. Clardy, Dr. Fatemi asked him to keep confidential their

-16-

conversation and her complaints. Dr. Clardy testified that, in response, he told Dr. Fatemi that he would not be able to help her unless he could speak with the Department to ensure that GME policies are followed. His objective was to make sure that Dr. Fatemi received due process and that the conditions of her probation were clear.

According to Dr. Clardy, he met with members of the Department in small groups to determine what the situation was with Dr. Fatemi. After the meetings, he was satisfied that it was Dr. Fatemi who was causing the disruption and that no one discriminated against her. Dr. Clardy was convinced that no residents or attending physicians took any action that would cause Dr. Fatemi to feel isolated, harassed, or unsafe. Dr. Fatemi disputes whether Dr. Clardy adequately looked into her allegation of gender discrimination.

Dr. Clardy testified that he met with Dr. Day on April 14, 2010, to make sure that Dr. Day was providing Dr. Fatemi with due process with her probation and advised him to rewrite Dr. Fatemi's initial probation letter. According to Dr. Clardy, he wanted to ensure that the letter was specific enough to notify Dr. Fatemi of her behaviors and performance that needed improvement.

Also on April 14, 2010, Dr. Day received an email from Dr. Samer Elbabaa, who, at the time, was an Assistant Professor of Neurological Surgery at UAMS and a neurosurgeon at ACH. Dr. Elbabaa stated that he was in "full agreement" with Dr. O'Brien "regarding our serious concerns of any future rotations for [Dr. Fatemi] at ACH." Dr. Elbabaa explained that ACH nursing staff had approached him "regarding their concerns with Dr. Fatemi's communication skills with families of kids on our neurological service" and expressed his understanding "that Dr. Fatemi had similar issues during her rotation at UAMS." He requested that Dr. Day not return Dr. Fatemi to "pediatric neurosurgical service until she shows an improvement of her communication skills and clinical performance."

-17-

As discussed in his meeting with Dr. Clardy on April 14, 2010, Dr. Day did write Dr. Fatemi a longer, more descriptive letter explaining the reasons she was placed on probation. Although the letter is dated *April 10, 2010*, Dr. Day did not give the letter to Dr. Fatemi until their meeting on *April 19, 2010*. The letter provides as follows:

> I have met with Jim Clardy, M.D.[,] the DIO for UAMS[,] who has asked me to provide more specific information in my communication to you. Therefore, my original letter to you regarding your status on April 6 has been amended as set forth below.
>
> On April 6, 2010, you met with myself, Dr. T. Glenn Pait, and Amy Keeland to discuss your situation in our neurosurgical residency program. As we indicated to you, there have been multiple complaints regarding your behavior and professionalism both at UAMS and [ACH] from multiple physicians and staff. These include disruptive behavior at the 4B nurse's station and a patient safety issue on 4D Neuro where you refused to remove soiled gloves before writing on patient charts at ACH. You have had uniformly poor interactions with fellow neurosurgical residents. You have also had poor interactions with residents of other services, Neurology in particular, which have been documented. You have refused at times to go to the operating room to help with cases you have been assigned. Attending surgeons have expressed concern regarding your ability to perform simple procedures safely even with the normal degree of supervision. Timely and adequate performance of History & Physicals as well as Consults has also been a specific problem that has been previously discussed with you. Timely completion of patient chart documentation has been a problem. Your knowledge of very basic surgical skills has also been questioned by the Faculty members. We discussed with you the specifics of these complaints and that we consider these behaviors to be inconsistent with the standards of our program. At this point you have failed to meet the behavioral standards that are expected in order to adequately function on the neurosurgery service. We also discussed incidents involving you that could have directly affected patient safety. An example is that mentioned above when you potentially exposed other patients and staff

-18-

to contamination by not removing your gloves when asked to by the nurse on 4D Neuro at ACH. Actions along these lines cannot be tolerated. Your ability to accurately place ventricular catheters has also not been demonstrated satisfactorily, which is a critical basic skill at the junior resident level.

You will continue to be supervised at the level of the other trainees in the program, as appropriate for your level of training. We will continue to monitor your progress, as we do for all residents, with respect to patient safety, patient care, professionalism and neurosurgical knowledge. We will be monitoring you based upon the following expectations:

- You will take instructions (including OR assignments) and suggestions without complaint[.]
- You will work in a socially acceptable manner with staff[.]
- There will be no yelling or demonstrations by you in front of patients and families[.]
- You will display no outbursts of anger with staff, colleagues, patients, or families[.]
- You will demonstrate basic surgical skills to the faculty's satisfaction such as suturing, tying, handling the drill to make burr holes and craniotomies, accurately placing ventricular catheters, safely placing lumbar drains, performing lumbar punctures, safely placing and managing central venous and arterial lines in the ICU, as basic examples.
- You will demonstrate to the faculty the acquisition of requisite knowledge on rounds, in conferences, and managing patients.
- You will provide timely and collegial consultations and interactions when on-call[.]

We have placed you on probation at this time and will reevaluate your progress in all of the above-mentioned areas involving professionalism,

patient safety, neurosurgical knowledge and patient care in six weeks, at which time we will formally meet. We also will review your progress with respect to participation in remedial counseling through the [EAP]. If you have not made sufficient progress with these behavioral and professionalism issues or if any new issues or incidents arise in the meantime, then I will move to dismiss you immediately from the neurosurgical residency program here at UAMS.

To summarize our interventions to help you:
- We will meet again formally in six weeks to reevaluate your progress[.]
- You will meet with Dr. Day every two weeks to discuss your progress[.]
- You have access to the Yasargil Microsurgical Laboratory to practice basic OR skills and should ask for faculty supervision to guide you[.]
- We have suggested that you participate in anger management counseling[.]

It is regrettable that this step has been taken but your actions have left us little choice. Our primary concern is for the safety and well being of our patients. Unprofessional conduct is not only a behavioral issue but also a patient safety issue and we therefore take this very seriously.

If you have any further questions regarding these issues or your status, please do not hesitate to contact me.

At the meeting, Dr. Fatemi refused to sign the letter and stated that she was going to consult with her lawyer. An hour before Dr. Fatemi's meeting with Dr. Day, she had told Dr. Charlie Teo in an email that she had hired a "high profile lawyer" from Los Angeles, California.[8]

_____

[8]In April 2010, Dr. Fatemi contacted an attorney about her residency. On April 9, 2010, Dr. Fatemi began secretly tape recording conversations with coworkers. She transcribed more than 30 conversations, including five with Dr. Day. The meeting of

On April 23, 2010, Dr. Day and Dr. Fatemi had another meeting. Dr. Day's contemporaneous notes, which he testified were incorrectly dated April 19, 2010, report that Dr. Day discussed Dr. Fatemi's progress with her and indicated to her that no reports of disruptive behavior had been lodged against her in the prior two weeks. He noted her "disheveled" appearance in wearing scrubs and a sweatshirt under a lab coat. According to Dr. Day's notes, Dr. Fatemi "assured [him] that she would do better." The notes state that Dr. Day discussed with Dr. Fatemi "the continued concerns of the faculty, especially Dr. Pait, regarding her poor attendance in the OR for assigned cases and/or not staying throughout assigned cases." Dr. Fatemi responded that her attendance was due to on-call duties, but Dr. Day pointed out that other residents did not have that problem. When Dr. Fatemi inquired about the cadaver lab, Dr. Day "assured her that she could have access . . . whenever she wished."

Dr. Fatemi recalls meeting with Dr. Day on April 23, 2010, "for the sole purpose of obtaining copies of the reports that were in [her] file which had been promised to [her] but had not been provided up until that point." She does recall Dr. Day mentioning that she should not wear sweatshirts in the future and that he would not allow the "guys" to wear them either. According to Dr. Fatemi, she had no problem with Dr. Day's dress-code directive.

---

April 19, 2010, is one of the occasions on which Dr. Fatemi secretly recorded Dr. Day. An unofficial transcript of this conversation is contained in the record, and Dr. Fatemi quotes portions of this transcript in her declaration.

In early May 2010, Dr. Day and Dr. Fatemi met again.[9] Dr. Day's contemporaneous notes of the meeting indicate that Dr. Fatemi again refused to accept responsibility for her problems in the program. Dr. Day wrote that Dr. Fatemi would not reasonably discuss her performance problems. Dr. Fatemi expressed her belief that she was being discriminated against because she was female. Dr. Day disagreed with her regarding any discrimination and explained that the issues leading to her probation were based on her unprofessional behavior, poor interpersonal interactions, and poor attendance in the OR. According to Dr. Day, Dr. Fatemi refused to accept any responsibility and blamed others for her problems in the program. Dr. Day later testified that Dr. Fatemi continuously interrupted him and, overall, that the meeting was contentious and unproductive.

Dr. Fatemi recalls Dr. Day asking her during the meeting about why she had gone over her allotted hours and accusing her of sneaking out of a case with Dr. Pait. According to Dr. Fatemi, she tried to explain that she did not sneak out but was reassigned to another case with another doctor.

On May 19, 2010, Dr. Fatemi went to the OR to assist Dr. Day with a surgery using a lateral suboccipital approach. Dr. Day's contemporaneous notes recorded the events that ensued as follows:

---

[9]Dr. Day recalled meeting with Dr. Fatemi on May 7, 2010, and his contemporaneous notes are labeled with that date; by contrast, Dr. Fatemi testified that although they had scheduled a meeting on May 7, 2010, Dr. Day had an emergency surgery that day, subsequently left town, and could not meet with her. According to Dr. Fatemi, they met on May 11, 2010. In his declaration, Dr. Day stated that before he left for the airport, he met with his personal physician at 8 a.m. and with Dr. Fatemi at 9:00 a.m. It was after the meeting with Dr. Fatemi on May 7, 2010, that he departed to catch his flight. We conclude that the date of this meeting is not a material fact, as both parties agree that this particular meeting occurred. We also note that Dr. Fatemi secretly recorded the meeting in question with Dr. Day and cites to portions of the unofficial transcript in her declaration.

I had Dr. Fatemi in my operating room today for a case of a cerebellar metastasis. We planned to perform this through a lateral suboccipital craniotomy. When I arrived at the room Dr. [Bulent] Yapicilar, chief resident,[10] was present as well as Dr. Fatemi. . . . Dr. Fatemi was anxious to show me some pictures she had performed in the laboratory just yesterday of a lateral suboccip[ital] approach. I made some comments with respect to what she had done in the pictures and I then instructed her to scrub in with Dr. Yapicilar.

I observed her with Dr. Yapicilar beginning the case. It was quite clear to me that she had trouble holding the scalpel properly. Her use of the cautery instrument was clumsy and poorly focused. All in all she appeared technically to be a level at or below what I would expect of a third year medical student.

I began asking her basic anatomy questions. I quizzed her on the muscles of the lateral neck that she [was] about to begin cutting through. It became immediate[ly] evident that she had no clue as to what . . . anatomy she was addressing. I instructed her to break scrub as she did not know the anatomy. I stated to her that my expectation was any resident performing an operation would know the basic anatomy before the case. I asked her if she knew she would be scrubbing on this case and she stated she did not know this. I then inquired that if she did not know that she possibly might be involved on this case why had she performed the exact approach on a cadaver just the day before. She did not have an answer for that. I suspect she was being untruthful.

Nevertheless she had no basic anatomical knowledge of the region she was approaching which I find quite unacceptable. I also find it unacceptable that if she was studying the same approach just the day before and still had no concept of the anatomy involved. This is definitely below the standard for a resident in neurosurgery at any level. I discussed this with her immediately at the time of my concern regarding her lack of preparation.

---

[10]Dr. Yapicilar became Chief Resident after Dr. DeCastro graduated.

Dr. Fatemi recalls the surgical experience with Dr. Day as being "humiliating." According to Dr. Fatemi, Dr. Day told her that she smelled of garlic in an aggressive, loud voice.[11] She maintains that she had never seen a surgery like this before and did not know that it involved the cutting of any neck muscles. She contends that Dr. Yapicilar was also unable to name the neck muscles but was not thrown out of the surgery. She asserts that Dr. Yapicilar never noticed her holding the scalpel improperly, as Dr. Day accused of her of doing.

On May 22, 2010, Dr. Day received an email from Dr. Fatemi reporting an event that occurred on May 21, 2010. According to Dr. Fatemi's email, Dr. Tabbosha and Dr. Al Hafez were in the call room sleeping. Her email claimed that because of a computer problem elsewhere, Dr. Fatemi needed to use the computer in the call room. The email provided that "Monir [Tabbosha] got very very upset when I eventually woke him up. I'm very afraid that as before he possibly makes another report to you or mainly to Dr. Pait." To follow up on Dr. Fatemi's report, Dr. Day spoke to Dr. Tabbosha and Dr. Al Hafez independently. Dr. Day asked Dr. Tabbosha to document his recounting of the incident in an email, which provides, in relevant part:

> I was in the call room,[12] when Dr[.] Fatemi start[ed] pounding very strongly and vigorously on the door. So, I opened the door immediately[,] and she start[ed] to Yale [sic] on me saying that she want[ed] [to] use this computer in the room specifically. [A]s you know there is [an]other neurosurgery office [o]n the same floor witch [sic]

---

[11]At oral argument, Dr. Fatemi's counsel highlighted Dr. Day's comment that Dr. Fatemi smelled of garlic. But neither in her appellate brief nor at oral argument did Dr. Fatemi offer an explanation of how that comment relates to her gender.

[12]In contrast to Dr. Fatemi's claim in her email that Dr. Tabbosha and Dr. Al Hafez were in the call room, Dr. Tabbosha testified that there was no one else "in the call room besides [him] when [Dr. Fatemi] came to the call room."

contains two computers in addition to our work room that ha[s] 2 other computers, plus [a] computer in front of every single patient room and around 10 portable ones. Dr[.] Fatemi continue[s] to mentally irritat[e] me, and create problems and conflicts for no reason.

Dr. Fatemi testified that because of her ongoing problems at UAMS, Dr. Day discussed resignation with her regularly, including on April 6, April 9, May 11, May 25, and May 28, 2010. Dr. Fatemi also wrote to Dr. Teo that Dr. Pait and others regularly asked her to resign. Both Dr. Day and Dr. Pait deny discussing resignation with Dr. Fatemi until Dr. Day's meeting with Dr. Fatemi on May 25, 2010.

On May 25, 2010, Dr. Day met with Dr. Fatemi to discuss the end of her six-week probation. Dr. Day created a memorandum contemporaneously with the May 25, 2010 meeting, which provides as follows:

> I met with Dr. Nasrin Fatemi today, which is six weeks now ending her probationary period. I discussed with her what I felt to be her lack of substantial progress in terms of interacting well with the residents. I discussed with her that I had another complaint this week from Dr. Tabbosha and Dr. Al Hafez regarding her behavior with them. I find these continued problems in terms of interacting with the other residents to be unacceptable and not consistent with what I had outlined for her to continue on in the program.
>
> We discussed the lack of preparation in the operating room for surgical cases. I specifically addressed the case last week when she was completely unprepared. I also even more importantly discussed with her my disappointment in her technical skills. She clearly did not have skills consistent with someone who was at least a second year resident. In fact, I thought her very basic skills of opening a patient's wound were below that of an intern level person. I discussed with her my opinion that she should be able to at least hold a scalpel properly and to use the electrocautery by this stage. She clearly was not able to do this satisfactorily.

-25-

She and I then had a long discussion with respect to her future in the program. We discussed numerous aspects of it. I related to her that I did not believe based on what I had observed of her technical abilities thus far to rectify this. I believe that she simply does not have any basic natural ability to perform surgery.

I also discussed [with] her continued problems in terms of interacting with her colleagues, both on the neurosurgery service and on other services. This lack of professionalism I find troubling, and she has clearly not been able to demonstrate a significant enough turnaround for me to have any confidence that she will be able to have acceptable professional relations in the future. This I believe will compromise her ability to properly care for patients.

She expressed the belief that she will not be successful if continuing in the program and I was in agreement with that assessment as it mirrored mine. She agreed with me that it would be best if she would not continue in the program going forward. I offered to help her in any way possible in terms of securing a new job. She indicated that she understood and that she would not return to UAMS for work the following morning.

Dr. Fatemi testified that, during the meeting, she told Dr. Day to "let [her] go," to which Dr. Day responded, "You can consider yourself let go."[13] When Dr. Fatemi asked whether she was fired, Dr. Day replied, "I think we're done." Dr. Fatemi then asked for confirmation that she was not to report to work the following day; Dr. Day stated, "Well[,] that's correct. Unless you know again if you want to if you need a job or need to stick around for the next 6 weeks and then finished that's fine." Dr. Fatemi responded, "No." Ultimately, Dr. Day gave Dr. Fatemi two options during the

---

[13]Dr. Fatemi secretly recorded the May 25, 2010 meeting with Dr. Day and relies on the unofficial transcript in her declaration in support of her recollection of events during the meeting. Dr. Day testified that there are some errors in the transcript but that most of it is accurate.

meeting: She could resign and remain on the payroll for the month of June or be terminated immediately for non-performance. According to Dr. Day, Dr. Fatemi's tendering of her resignation would indicate a mutual agreement that she "is not a good fit in the program here in Arkansas." He explained that if he terminated her, then he would have to "be clear [about] the circumstances of [her] leaving" to anyone who called for a reference; thus, potential employers would know that she got fired.

Dr. Fatemi admitted during her meeting with Dr. Day to "hav[ing] a horrible communication issue" and not always "communicat[ing] well." Dr. Day then stated that Dr. Fatemi's "English is not as good as [he] thought." Dr. Fatemi agreed, stating, "That's true." When Dr. Day noted Dr. Fatemi's admission that she "ha[s] [a] problem communicating with people," Dr. Fatemi replied, "No, yah that's true." Dr. Day believed this to be a "character" trait of Dr. Fatemi's, but she countered that she is a good communicator when she is "comfortable." According to Dr. Fatemi, "[T]he day that you put me not to be under pressure I'm g[onna] get completely comfortable with excellent communication. You put me in this I just stop communicating." She further stated, "The day . . . you put me in [my] comfort zone will be different. And I know myself[.] I am horrible when somebody put[s] me in huge pressure like this, and I've been under this pressure for the . . . started almost [the]1st week. I know neurosurgery has a lot of pressure but having this . . . ."

After the meeting, Dr. Fatemi sent an email to Dr. Dan Kelly, under whom she had served as a fellow in California, stating, "I just got fired by J.D. [(Dr. Day)]." Notwithstanding this email, on May 25 and 26, 2010, Dr. Day and Dr. Fatemi exchanged emails regarding Dr. Fatemi's possible resignation in lieu of termination. After the May 25, 2010 meeting, Dr. Day sent an email to the Department staff stating that Dr. Fatemi would not be continuing in the program at UAMS. Within an hour, Dr. Fatemi responded that she was looking for a position in California and would like Dr. Day to write her a letter of recommendation. She added "my family lives in California and I am dying to go back there any minute."

On May 26, 2010, Dr. Fatemi did not report for work. That evening, Dr. Day sent Dr. Fatemi an email reminding her that he needed her letter of resignation by 5:00 p.m. on May 27, 2010. A few hours later, Dr. Fatemi sent Dr. Day an email claiming that she never agreed to resign and that Dr. Day had fired her. Although Dr. Fatemi claimed that Dr. Day had fired her, she reported to work the following day on May 27, 2010.

On May 28, 2010, Dr. Day sent Dr. Fatemi an email to explain her options: Dr. Fatemi could resign and finish the academic year by performing non-clinical duties until June 30, 2010. If she chose to resign, Dr. Day requested that she have a letter of resignation to his office by 5:00 p.m. on June 1, 2010. If she chose not to resign by that time, then Dr. Day explained that he would be forced to terminate her from the program. Within a couple of hours, Dr. Fatemi acknowledged receipt of the email.

Dr. Fatemi did not tender her resignation by the June 1, 2010 deadline; as a result, Dr. Day considered her employment terminated. On June 2, 2010, Dr. Day sent Dr. Fatemi a letter officially terminating her employment, effective June 3, 2010.

Dr. Fatemi filed an official grievance letter on June 11, 2010, claiming that she had been discriminated against based on gender, national origin, and because she "did not go along with the discriminatory atmosphere against individuals with different gender or believes [sic]." Several months later, on November 19, 2010, Dr. Clardy received a letter from Dr. Fatemi's counsel that Dr. Fatemi had decided to discontinue her request for a grievance hearing. In short, the letter stated Dr. Fatemi's belief that the grievance hearing would not serve a useful purpose and that the process was unfair.

On June 2, 2011, Dr. Fatemi filed suit against UAMS, Associate Vice Chancellor Hosea Long, Dr. Clardy, Dr. Fiser, and Dr. Day for claims of discrimination on the basis of race, national origin, and gender; damage to her

professional reputation; violations of due process and equal protection under the Arkansas and United States Constitutions; violations of the First Amendment of the United States Constitution and the Arkansas Public Employees Political Freedom Act; and interference with her business expectancy in continuing work at UAMS. She also alleged that the defendants retaliated against her for consulting a lawyer and complaining about discrimination. The defendants moved for summary judgment. In ruling on the motion, the district court dismissed without prejudice Dr. Fatemi's abandoned claims alleging discrimination based on national origin, race, and religion, as well as her Public Employees Political Freedom Act, § 1981, and First Amendment claims. The district court dismissed UAMS as a defendant with prejudice because it is not a legal entity that may sue or be sued. The court also dismissed with prejudice Dr. Fatemi's Title VII claims against Dr. Long, Dr. Clardy, Dr. Fiser, and Dr. Day because supervisors may not be held individually liable under Title VII. The district court also granted summary judgment to the defendants on Dr. Fatemi's gender-discrimination and retaliation claims.

## II. *Discussion*

On appeal, Dr. Fatemi challenges only the district court's grant of summary judgment to the defendants on her gender-discrimination claim.[14] She argues that the district court erroneously made credibility determinations, failed to consider all of her evidence, considered evidence from the non-movant that it should have ignored, and drew inferences in favor of the defendants instead of her as the non-moving party.

"We review de novo the district court's grant of summary judgment to the [defendants], viewing the facts in the light most favorable to [Dr. Fatemi] and giving

---

[14]At oral argument, Dr. Fatemi's counsel expressly acknowledged that Dr. Fatemi was no longer pursuing her retaliation claim and was pursuing only her gender-discrimination claim. Moreover, "[s]ince there was no meaningful argument on this claim in [her] opening brief, it is waived." *Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004).

her the benefit of all *reasonable* inferences from the record." *Butler v. Crittenden Cnty., Ark.*, 708 F.3d 1044, 1048 (8th Cir. 2013) (emphasis added) (citation omitted). We will affirm a district court's grant of summary judgment where "no genuine dispute as to any material fact [exists] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To establish a genuine issue of material fact, Dr. Fatemi "may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in [her] favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005) (citation omitted).

For Dr. Fatemi to prevail on her gender-discrimination claim, she "must show either direct evidence of discrimination or evidence that is sufficient to create an inference of discrimination under the *McDonnell Douglas* burden shifting framework." *Butler*, 708 F.3d at 1050 (citation omitted). Because Dr. Fatemi has presented no direct evidence of discrimination, she must prove gender discrimination under the *McDonnell Douglas* burden-shifting framework. *See id*. A plaintiff establishes a prima facie case of gender discrimination by proving "that she (1) is a member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) can provide facts that give rise to an inference of unlawful sex . . . discrimination." *Id*. (citation omitted). The defendants must then "provid[e] a 'non-discriminatory, legitimate justification for [their] conduct, which rebuts the employee's prima facie case.'" *Twiggs v. Selig*, 679 F.3d 990, 993 (8th Cir. 2012) (alteration in original) (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850 (8th Cir. 2005), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)). "Once the [defendants] provide[] this reason, the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." *Id*. (quotation and citation omitted).

The defendants implicitly assume in their brief that Dr. Fatemi has satisfied her prima face case.[15] "We may 'assum[e], without deciding, that [Dr. Fatemi] presented a *prima facie* case of [gender] . . . discrimination.'" *Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1229 (8th Cir. 2013) (first and fourth alterations in original) (quoting *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012)).

Dr. Fatemi also "has not challenged the district court's finding that the . . . defendants articulated non-discriminatory, legitimate justifications for terminating [Dr. Fatemi]." *Id*. The district court summarized the defendants' legitimate, non-discriminatory reasons for Dr. Fatemi's termination as follows:

> The record reveals multiple instances of Dr. Fatemi's disputative behavior and her repeated refusal to take responsibility for her problems interacting with hospital and university personnel. Dr. Pait testified that her inability to work well with other residents compromised patient care. She met offers of help with hostility. Her file contains multiple accounts of unprofessional demeanor and refusals to take responsibility for her behavior. Others reported that Dr. Fatemi did not appear for or walked out on surgeries or duties assigned to her. In the absence of any indication that those reporting these deficiencies were motivated by any discriminatory animus, *e.g. Diaz v. Tyson Fresh Meats, Inc*., 643 F.3d 1149, (8th Cir. 2011), her supervisors were entitled to believe that the reports from multiple people without any direct interest were true. Dr. Day also testified that he had concerns about Dr. Fatemi's untruthfulness, based on his own dealings with her. Apart from the friction with coworkers and supervisors, the record reflects objective performance problems, some as basic as her not holding a scalpel correctly.

(Footnotes omitted.)

---

[15]The defendants do not address whether Dr. Fatemi has satisfied her prima face case in their brief; instead, they focus on whether she has proved pretext.

"[W]e conclude that the district court correctly determined that the . . . defendants satisfied this non-onerous burden." *Burton*, 737 F.3d at 1230 (citation omitted). As a result, Dr. Fatemi "must 'prove that the proffered justification[s] [are] merely a pretext for discrimination.'" *Id*. (alterations in original) (quoting *Bone*, 686 F.3d at 955). The burden of persuasion is on Dr. Fatemi at all times. *Id*. (citation omitted). "At this stage, [Dr. Fatemi's] obligation to demonstrate 'a genuine issue of material fact regarding pretext merges with the ultimate burden of persuading the court that [Dr. Fatemi] was the victim of intentional discrimination.'" *Id*. (quoting *Bone*, 686 F.3d at 955). A strong prima facie case in combination with proof of pretext may be sufficient to raise "'a triable question of fact as to whether the termination was motivated by intentional discrimination.'" *Id*. (quoting *Bone*, 686 F.3d at 955). But a "bare assertion and speculation as to [an employer's] motive does not create a genuine issue of material fact." *O'Brien v. Dep't of Agriculture*, 532 F.3d 805, 811 n.3 (8th Cir. 2008) (citation omitted).

A. *No Female Has Graduated from the Neurosurgery Program*

Prior to Dr. Fatemi, the UAMS neurosurgery program had two other female neurosurgery residents—Dr. Robin Mitchell and Dr. Mollie Atherton Meek. Dr. Mitchell's husband murdered her during her final year of residency, when she was serving as Chief Resident. Dr. Atherton Meek, a neurosurgery resident from June 2005 to June 2006, left voluntarily to pursue a residency in interventional radiology at UAMS. Thus, at the time Dr. Fatemi entered the neurosurgery program, no woman had completed the program.[16]

---

[16]Since coming to UAMS, Dr. Day has hired two female neurosurgeons, Dr. Erika Petersen and Dr. Eylem Ocal, who currently serve as faculty and attending physicians in the UAMS neurosurgery program. Dr. Day has also attempted to bring in female neurosurgery residents every year. The Department has consistently ranked female applicants within its top choices, but they have gone to other programs.

Dr. Fatemi contends that the "uncontradicted evidence" that no women have graduated from the neurosurgery program "is circumstantial proof of pretext." *Bogren v. Minn.*, 236 F.3d 399, 406 (8th Cir. 2000) ("Bogren also contends the fact that she is the only black female trooper (and one of few black troopers) ever employed by the patrol is circumstantial proof of pretext."). This evidence may be consistent with a discriminatory pretextual purpose but, alone, does little to establish it in the absence of proof of animus.

"[S]tatistical evidence 'may support a finding of pretext, particularly where there are independent, direct grounds for disbelieving the employer's explanation for discharge.'" *Id*. (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 778 (8th Cir. 1995)). Having examined the full record, we conclude that Dr. Fatemi's evidence "is insufficient to establish a genuine issue of pretext" because "there is no independent evidence to support a finding of pretext." *Id*. Dr. Meek testified that, during her year as a female neurosurgery resident at UAMS from June 2005 to June 2006, she never felt discriminated against because of her gender. She never felt anything less than an equal member of the team. She never heard any derogatory statements made about women or witnessed any discriminatory actions or statements made on the basis of gender. Dr. Fatemi has offered no evidence to undermine Dr. Meek's testimony and, in fact, Dr. Fatemi admitted to such facts in response to the defendants' motion for summary judgment. Moreover, as discussed *infra*, Dr. Fatemi's "evidence of pretext is wholly insufficient to create a genuine issue of material fact under Rule 56" to show that the defendants' actually terminated her because of her *gender*. *See* Part II.B–H.

## B. *Similarly-Situated Employees*

Next, Dr. Fatemi argues that she established pretext by demonstrating that similarly situated male residents were treated more favorably. Specifically, she cites Dr. Tabbosha, Dr. B.Y., Dr. B.E., and Dr. N.S. as valid comparators.

At the pretext stage, we apply a "rigorous" test for determining whether employees are similarly situated to the plaintiff. *Burton*, 737 F.3d at 1230. This means that Dr. Fatemi must prove that she and the male employees "were similarly situated in all relevant respects." *Id*. (quotations and citations omitted). "Similarly situated in all relevant respects" means that the male employees that Dr. Fatemi has identified "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id*. (quotations and citations omitted).

We do not, however, "require the plaintiff to produce evidence of a clone." *Id*. at 1230–31 (quotation and citation omitted). This means that Dr. Fatemi "need only establish that . . . she was treated differently than other employees whose violations were of *comparable seriousness*." *Id*. at 1231 (quotations and citations omitted). Thus, the comparator need not "have engaged in precisely identical conduct" or "the exact same offense." *Id*. (quotations and citations omitted).[17]

First, Dr, Fatemi identifies Dr. B.Y. as a valid comparator. Dr. Fatemi cites to evaluations for Dr. B.Y. from August–December 2006, January–June 2007, January–June 2008, and July–December 2009 by Dr. Pait, Dr. Ali Krisht, Dr. Al-Mefty, and Dr. McDonnell. In summary, these evaluations note that B.Y. needed improvement in his basic surgical skills, basic knowledge, acceptance of criticism, handling of calls from nurses, getting medical records on time, and interpersonal and communication skills. Additionally, Dr. Fatemi cites a September 17, 2009 email

---

[17]After the parties submitted their briefs, Dr. Fatemi moved to file a supplemental brief to include the comparator standard set forth in *Burton*. Because we are fully aware of *Burton* and the cases cited therein, we conclude that supplemental briefing is not necessary and therefore deny the motion.

from Dr. Teodora Terlea[18] in which Dr. Terlea complained of Dr. B.Y.'s "inappropriate," "unprofessional[ ]," "disrespectful," and "disruptive" behavior toward Dr. Terlea on one occasion. All of the cited evaluations and Dr. Terlea's complaint occurred during either Dr. Al-Mefty's tenure as Department Chair or Dr. Pait's tenure as Interim Chair, not during Dr. Day's tenure.[19] Thus, these asserted comparators fail for the absence of the same supervisor.

Second, Dr. Fatemi asserts that Dr. B.E. is a valid comparator. On Dr. B.E.'s July–December 2006 evaluation, Dr Pait noted that Dr. B.E. "appear[ed] overwhelmed" but observed that "perhaps, with time[,] his confidence will improve." On March 9, 2007, Dr. Therese McBride, Associate Clinical Professor in the UAMS Department of Emergency Medicine, lodged a complaint against Dr. B.E. via email, asserting that he was "loud, abrasive[,] and unprofessional not only with the ER residents but also with both ED attendings. His behavior cannot be tolerated in this department." In both the July–December 2007 and January–June 2008 "Summation Evaluations" of Dr. B.E., Dr. Al-Mefty noted that he discussed Dr. B.E.'s "medical record delinquency reports" with him. Both evaluations also indicated Dr. B.E.'s need for technical improvement. On September 15, 2008, Dr. James Graham, Professor of Pediatrics and Chief of the Section of Pediatrics Emergency Medicine, wrote a letter to Dr. Al-Mefty describing an incident in which Dr. B.E. refused "to see [a] child with

---

[18]Dr. Terlea is employed at the Central Arkansas Veterans Healthcare System, John L. McClellan Memorial Veterans Hospital in Little Rock, Arkansas.

[19] Dr. Fatemi cites no complaints lodged by others against Dr. B.Y. during Dr. Day's tenure; instead, before the district court, she cited only to a "Graduating Resident Evaluation" that Dr. Day completed for Dr. B.Y. in July 2011 in which Dr. Day notes that Dr. B.Y. "[h]ad some difficulty with patients and fellow residents" and "[n]eeds to improve communication skills." To the extent that Dr. Day's evaluation constitutes new "complaints" against Dr. B.Y., we agree with the district court that these complaints do not match the "number and severity of complaints" lodged against Dr. Fatemi.

a head injury and altered mental status." Dr. Graham characterized Dr. B.E.'s "medical judgment" as "clearly wrong" and indicated that his actions were not only "medically inappropriate and unprofessional" but potentially "in violation of federal law as well" for his failure to see the patient. All of the cited evaluations and the two complaints lodged against Dr. B.E. occurred during Dr. Al-Mefty's tenure as Department Chair, well before Dr. Day's tenure.[20]

Third, Dr. Fatemi contends that Dr. N.S. is a valid comparator. The defendants concede that Dr. N.S. "came close to receiving the number and severity of complaints as [Dr.] Fatemi did." As the district court noted, Dr. N.S. was "a 2004 resident who was allowed to finish his contract before he was asked to leave UAMS for medical errors and behavioral issues." All of the medical errors and behavioral issues concerning Dr. N.S. occurred in 2004 and 2005, when Dr. Al-Mefty was the Department Chair and the decisionmaker as to Dr. N.S.'s probationary period and the completion of Dr. N.S.'s contract.

---

[20]Dr. Fatemi cites no complaints lodged by others against Dr. B.E. during Dr. Day's tenure; instead, before the district court, Dr. Fatemi cited to a June 1, 2010 letter from Dr. Day to Dr. Neil A. Martin, Professor, Chairman, and Resident Program Director at the David Geffen School of Medicine at the University of California at Los Angeles (UCLA). The letter concerns Dr. B.E.'s transfer from UAMS to UCLA and states that Dr. Day would release Dr. B.E. at the end of June 2010. Dr. Day "gathered the comments of the faculty [at UAMS] to complete [Dr. B.E.'s] evaluations since [Dr. Day] ha[d] only been around [Dr. B.E.] for two months now." He cited Dr. B.E.'s "deficiencies" as "be[ing] rather hard on the intensive care unit nursing staff," needing improvement in his microsurgical skills, having a tremor, and being overly confident or cocky. But Dr. Day also opined that Dr. B.E. "is a well liked and generally pleasant colleague to his resident peers" who is "reliable" and dependable. Dr. Day believed that Dr. B.E. would become "a competent general neurosurgeon who can serve adequately whatever community he desires to serve." We agree with the district court that the "deficiencies" that Dr. Day identifies in this transfer letter do not match the "number and severity of complaints" that Dr. Fatemi had lodged against her.

In summary, the incidents that Dr. Fatemi identifies involving Dr. B.Y., Dr. B.E., and Dr. N.S. all occurred *prior to* Dr. Day's tenure as Department Chair. We agree with the district court that Dr. B.Y., Dr. B.E., and Dr. N.S. are not valid "comparators because the incidents Dr. Fatemi cites occurred before Dr. Day chaired the Department"; i.e., they had a different ultimate supervisor who was the actual decisonmaker. *See, e.g.*, *Floyd-Gimon v. Univ. of Ark. for Med'l Sciences ex rel. Bd. of Trustees of the Univ. of Ark.*, 716 F.3d 1141, 1150 (8th Cir. 2013) (gender-discrimination case) ("Floyd–Gimon did not produce any evidence her comparators had the same supervisor . . . ."); *Bennett v. Nucor Corp.*, 656 F.3d 802, 819 (8th Cir. 2011) (race-discrimination case) ("The plaintiffs also did not show that the same supervisors were responsible for granting training to white employees while denying the plaintiffs' requests.").

The only comparator for which Dr. Day was the Department Chair when complaints were lodged against the resident is Dr. Tabbosha, a male resident who arrived at UAMS at the same time as Dr. Fatemi and was one year her senior in the neurosurgery program. Dr. Fatemi argues that Dr. Tabbosha made homophobic remarks; refused to treat homosexual patients; and yet still received the highest possible rating in the category dealing with adherence to a code of moral and ethical values, respect for patients, and sensitivity to patients' cultural values by Dr. Pait. This occurred despite the fact that Dr. Pait counseled Dr. Tabbosha for his remarks about, and treatment of, homosexual patients. She also argues that she reported him for "extremely serious errors in diagnosing patients that would have led to those patients having unnecessary surgery and possibly a second operation." And, she asserts that Dr. McDonnell testified that he did not document these mistakes because he did not want to harm Dr. Tabbosha's reputation. Finally, she argues that UAMS was trying to build a case against her, so it accepted Dr. Tabbosha's false accusation that she failed to assist Dr. Yasargil on a case without an investigation.

Viewing the facts in the light most favorable to Dr. Fatemi and assuming that all of the allegations against Dr. Tabbosha are true, we agree with the district court that Dr. Fatemi cites no "evidence that [Dr.] Tabbosha was unwilling to accept responsibility, was dishonest, or made no efforts to improve." Furthermore, while our case law does not require the comparator to be a "clone," it *does* require that "the misconduct of more leniently disciplined employees must be of comparable seriousness." *Burton*, 737 F.3d at 1230 (quotations and citations omitted). Here, Dr. Fatemi's documented errors are far more substantial and over a shorter period of time; she was documented as argumentative, difficult and untrustworthy, jeopardizing patient safety, failing to take directives, failing to document, erroneously assessing a patient, lacking the ability to perform necessary surgical skills, unprofessional and disrespectful, failing to communicate with colleagues, refusing to attend a surgery, and breaching protocol.

As to Dr. Fatemi's accusation that Dr. Tabbosha made a false accusation against her,

> [t]he critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge. A plaintiff seeking to survive an employer's motion for summary judgment must therefore show a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination.

*McCullough v. Univ. of Ark. for Med'l Sci.*, 559 F.3d 855, 861–62 (8th Cir. 2009) (internal citations omitted). Dr. Fatemi has provided no evidence that the defendants acted based on an intent to discriminate as opposed to a good-faith belief that Dr. Fatemi committed the offense that Dr. Tabbosha reported.

Finally, Dr. Fatemi has presented no evidence to substantiate her allegation that her disciplinary record is more substantial than that of male residents because UAMS intended to discriminate against her *based on her gender.* As discussed *supra*, Dr. Meek's uncontroverted testimony belies a gender-based discriminatory environment in the Department. We also note that several of the reports of Dr. Fatemi's unprofessional behavior and medical errors came from *females*—Ashley Lumpkin, Dr. Nancy Maalouf, Julie Holmes, and Tara Johnson. There is no evidence that these females colluded with the defendants to further gender-based discrimination against Dr. Fatemi.

## C. *Training by Dr. Gandhi*

Dr. Fatemi argues that a genuine issue of material fact exists as to whether she was discriminated against based on her gender during her first week at UAMS when Dr. DeCastro told Dr. Fatemi, a female PGY-2, to follow and receive training from Dr. Gandhi, a male PGY-1.

Like the district court, we conclude that no genuine issue of material fact exists regarding Dr. Gandhi's training and orientation of Dr. Fatemi. Dr. Gandhi, a PGY-1, had been with the Department since July 2009 and had attended both graduate school and medical school at UAMS; thus, he was very familiar with the campus and computer systems. Although Dr. Gandhi does not recall anybody at UAMS specifically telling him to aid Dr. Fatemi in her transition, he testified that his perceived "role . . . was to help her transition" by showing her around the campus. Dr. Gandhi also testified that, like Dr. Fatemi, he also oriented Dr. Tabbosha, a male PGY-3 with similar inexperience at UAMS. Dr. Fatemi has not challenged Dr. Gandhi's testimony that he oriented both Dr. Fatemi, a female, and Dr. Tabbosha, a male, who were both senior to Dr. Gandhi. Because both senior male and female residents received the same treatment, no reasonable factfinder could draw an inference of gender discrimination.

D. *Dr. DeCastro's Treatment of Dr. Fatemi*

Dr. Fatemi asserts that a genuine issue of material fact exists as to whether Dr. DeCastro's communication with Dr. Fatemi and about Dr. Fatemi to other students shows gender discrimination.

Dr. Fatemi started complaining of gender discrimination to Dr. DeCastro shortly after her entry into the program. Dr. DeCastro insisted that a third party be present when he spoke with Dr. Fatemi pursuant to Dr. Pait's and UAMS's attorney's instructions. Dr. Fatemi claims that "Dr. DeCastro made sure that the other residents would be wary of me." Dr. DeCastro testified that he *did not* tell the other residents that Dr. Fatemi claimed gender discrimination; instead, he only told them to have a third party present for meetings with Dr. Fatemi.

Dr. Fatemi argues that "[a] jury could disbelieve, and indeed is not required to believe for purposes of summary judgment, Dr. DeCastro's claim, first made after litigation began."

We conclude that no genuine issue of material fact exists whether Dr. DeCastro's treatment of Dr. Fatemi evidences gender discrimination. First, as the district court concluded, "[s]imply having someone else present during a contentious or sensitive conversation is not discriminatory or hostile." Second, once the defendants moved for summary judgment, Dr. Fatemi "was required to 'discard the shielding cloak of formal allegations and meet proof with proof by showing a genuine issue as to a material fact." *Pace v. Portfolio Recovery Assoc., LLC*, 512 F. App'x 643, 645 (8th Cir. 2013) (per curiam) (quotation and citation omitted). Dr. Fatemi has failed to identify any record evidence disputing Dr. DeCastro's claim that he did not tell anyone about the discrimination allegations that Dr. Fatemi made.

E. *Dr. McDonnell's 2010 Memorandum*

Dr. Fatemi also disputes whether Dr. McDonnell's February 20, 2010 memorandum, documenting problems with Dr. Fatemi's performance during a surgery, constituted a "criticism" of her surgical skills that the defendants could rely on in justifying her termination. According to Dr. Fatemi, the record as a whole shows that she successfully completed the advanced surgery and was complimented by Dr. McDonnell, who assisted. She cites his testimony that he would not have permitted her to do the surgery unless he thought she was capable. According to Dr. Fatemi, while the defendants pointed to Dr. McDonnell's memorandum as evidence that Dr. Fatemi was not competent and even a danger to patients, the memorandum shows that Dr. McDonnell merely found Dr. Fatemi to be inexperienced , which is not a criticism but instead an observation made for teaching purposes. She concludes that the proper inference to be drawn from Dr. McDonnell's memorandum and testimony "is that the University was straining to build a case against her, even to the extent of misusing its records."

We agree with the defendants that Dr. Fatemi's subjective belief that Dr. McDonnell's memorandum is not a "criticism" of her surgical skills is irrelevant. The question is not whether Dr. Fatemi was actually inexperienced or whether characterizing Dr. Fatemi as "inexperienced" is a criticism of her, but whether the defendants in good faith relied on Dr. McDonnell's memorandum documenting Dr. Fatemi's inexperience as *one of several* justifications for her discharge. *See McCullough*, 559 F.3d at 861. Dr. Fatemi must "show a genuine issue for trial about whether the [defendants] acted based on an intent to discriminate rather than on a good-faith belief that [Dr. Fatemi] committed misconduct justifying termination." *Id.* (citation omitted).

Dr. Fatemi's argument that the defendants were "straining to build a case against her" in relying on Dr. McDonnell's memorandum is mere speculation that "does not create a genuine issue of material fact." *See O'Brien*, 532 F.3d at 811 n.3.

-41-

Dr. Fatemi has provided no evidence that the defendants acted based on an intent to discriminate against her on the basis of gender in relying on Dr. McDonnell's memorandum as one of several justifications for her discharge.

## F. *ACH Complaints*

Dr. Fatemi contends that a genuine issue of material fact exists as to whether her reassignment to ACH was to add negative documentation to her file to support a rationale, other than gender discrimination, for terminating her. According to Dr. Fatemi, while Dr. Pait testified that he sent her to ACH to give her a "fresh start," the defendants were actually "attempt[ing] to create documentation to support terminating [her]" by "sen[ding] her to a children's hospital that she was inadequately prepared for and received no orientation to acclimate her." She emphasizes that "[r]esidents were normally only sent to the children's hospital after they had been in the neurosurgery program for a while" and argues that it is "common knowledge that nurses at the children's hospital often wrote up residents more often than was probably necessary."

Dr. Fatemi merely speculates that Dr. Pait's actual motivation to transfer her to ACH was to add negative documentation to her file. *See O'Brien*, 532 F.3d at 811 n.3. She has neither alleged nor produced any evidence that Dr. Pait and Dr. O'Brien, or any other member of the ACH staff, conspired to create negative documentation in her file upon her transfer to support a justification, other than gender discrimination, for terminating her. The undisputed facts are that Dr. O'Brien requested that Dr. Fatemi be reassigned to UAMS after he received two complaints from female staff members about Dr. Fatemi's behavior. Whether these complaints were actually true is not the issue; instead, the issue is "whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *McCullough*, 559 F.3d at 861 (citations omitted). Dr. Fatemi has failed to offer any evidence that Dr. O'Brien had reasons to disbelieve the female nurses' reports, that Dr. O'Brien's actions were motivated by gender discrimination, or that the defendants had reason to disbelieve

Dr. O'Brien's report about Dr. Fatemi's behavior while at ACH. Nothing in the record indicates that the events at ACH or the defendants' reaction to those events were made in bad faith as a pretext for gender discrimination.

### G. *Reasons for Dr. Fatemi's Termination*

Finally, Dr. Fatemi argues that a genuine issue of material fact exists as to whether the defendants' reasons for disciplining and terminating Dr. Fatemi were untruthful and shifting explanations. According to Dr. Fatemi, the second probationary letter that Dr. Day gave her on April 19, 2010, contained new and false allegations about her competency. She contends that "a jury could disbelieve Dr. Day's letters explaining his reasons for termination and choose to believe that his letters and his ever expanding explanations as to her discipline were in response to her complaints, and not actual problems with Dr. Fatemi's performance as a resident."

A plaintiff may set forth evidence "of 'shifting explanations' . . . [that] give rise to an inference of pretext." *EEOC v. Trans States Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006) (citations omitted).

> [A] substantial change in an employer's legitimate, nondiscriminatory reason for firing an employee may be probative of pretext, but we have been clear that these discrepancies must actually be substantial. *See E.E.O.C. v. Trans States Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006). Where employers "gave two completely different explanations for their decisions to terminate their employees," such a substantial change is established. *Id.* (citing *Briscoe v. Fred's Dollar Store, Inc.*, 24 F.3d 1026, 1027–28 (8th Cir. 1994) and *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994)). However, where the employer "has not wavered from its one explanation for terminating" the employee, there is no substantial change. *Trans States Airlines, Inc.*, 462 F.3d at 995.

*Twiggs*, 679 F.3d at 994.

-43-

A plaintiff must do more than identify discrepancies or inconsistences in an employer's rationale for terminating the plaintiff to prove that the employer gave "shifting explanations." *See Trans States*, 462 F.3d at 995. "In *Young, Briscoe*, and *Ethan Allen*, the employers gave two completely different explanations for their decisions to terminate their employees, and such a substantial change in position supported an inference of pretext." *Id.* (citing *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998); *Briscoe*, 24 F.3d at 1027–28; *Ethan Allen*, 44 F.3d at 120). By contrast, in *Trans States*, we found that a mere "discrepancy" or "inconsistent explanation" was not a "'shifting explanation' that we have said would give rise to an inference of pretext." *Id.*

Dr. Fatemi has failed to satisfy her burden of proving that the defendants provided "shifting explanations" for her termination because the two letters that Dr. Day authored concerning Fatemi's probation are not "a substantial change in position" or "completely different explanations" for Dr. Day's decision. The first letter summarily concludes that Dr. Fatemi was placed on probation because of her "failure to meet behavioral standards" and because of "incidents involving [Dr. Fatemi] that could have directly affected patient care and safety." The second letter expounds on the first letter, setting forth examples of Fatemi's behavioral problems and problems with patient-care skills. As the district court explained:

> Dr. Fatemi exhibited a pattern of behavioral and performance problems that accumulated over time. Some new incidents had accrued since her last meeting with her supervisors; and the amended probation letter's contents generally reflected the problems discussed in earlier meetings between Dr. Fatemi and faculty. Also, Dr. Fatemi was not terminated until six weeks later. She thus had a month and a half to rectify any misunderstanding and improve her performance.

(Footnotes omitted.)

-44-

## H. *Summary*

We have reviewed the entire, voluminous record and considered each of Dr. Fatemi's arguments concerning pretext. While the record reflects an atmosphere of contentiousness and discord between Dr. Fatemi and her coworkers during her residency at UAMS, there is no evidence that such discord was the product of intentional *gender* discrimination. As the district court explained, "A reasonable jury could come to only one conclusion on gender discrimination after considering all the undisputed material facts, and considering the few disputed facts in Dr. Fatemi's favor. She lost her place at UAMS because of her many professional shortcomings as a resident, not because she is a woman."

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____